IN THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| *Ex rel.* HAZEL PRACHT and | ) | |
| JENNIFER KRATSON, | ) | |
| | ) | CIVIL ACTION NO. 2:19-cv-00356-DCN |
| Plaintiffs-Relators, | ) | |
| | ) | |
| v. | ) | **QUI TAM ACTION** |
| | ) | |
| LEGACY HEALTHCARE | ) | |
| SERVICES, INC., SANRDA HOSKINS, | ) | |
| THE DEACONESS HEALTH CARE | ) | |
| SERVICES CO., and THE DEACONESS | ) | |
| ASSOCIATIONS, INC. | ) | |
| | ) | |
| Defendants. | ) | |

---

## FILED IN CAMERA AND UNDER SEAL

---

## COMPLAINT PURSUANT TO 31 U.S.C. §3729-3732 OF THE FEDERAL FALSE CLAIMS ACT

**None of the allegations set forth in this Complaint are based on a public disclosure of allegations or transactions in a criminal, civil or administrative hearing, in a congressional, administrative or General Accounting Office report, hearing, audit or investigation, or from the news media. Relators are the original source of this information.**

*Signature on the Following Page*

Respectfully Submitted,

**BOWERS LAW OFFICE LLC**

s/ Karl S. Bowers, Jr.

Karl S. Bowers, Jr.
Bowers Law Office LLC
Fed. Bar No. 7716
P.O. Box 50549
Columbia, South Carolina 29250
Telephone: (803) 753-1099
Telecopier: (803) 250-3985
E-Mail: butch@butchbowers.com

**MILLER LAW GROUP, PLLC**

s/ W. Stacy Miller, II

W. Stacy Miller, II (pending admission *pro hac vice*)
Miller Law Group, PLLC
Post Office Box 1769
Raleigh, North Carolina 27612
Telephone: (919) 348-4361
Telecopier: (919) 729-2953
E-Mail: stacy@millerlawgroupnc.com
N.C. State Bar No. 21198

s/ Blannie Cheng

Blannie Cheng (pending admission *pro hac vice*)
Miller Law Group, PLLC
Post Office Box 1769
Raleigh, North Carolina 27612
Telephone: (919) 348-4361
Telecopier: (919) 729-2953
E-Mail: blannie@millerlawgroupnc.com
N.C. State Bar No. 41156

IN THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| *Ex rel.* HAZEL PRACHT and | ) | |
| JENNIFER KRATSON, | ) | |
| | ) | CIVIL ACTION NO. |
| Plaintiffs-Relators, | ) | |
| | ) | COMPLAINT AND DEMAND FOR |
| v. | ) | JURY TRIAL |
| | ) | |
| LEGACY HEALTHCARE | ) | FILED UNDER SEAL PURSUANT |
| SERVICES, INC., SANRDA HOSKINS, | ) | TO 31 U.S.S. § 3730(b)(2) |
| THE DEACONESS HEALTH CARE | ) | |
| SERVICES CO., and THE DEACONESS | ) | |
| ASSOCIATIONS, INC. | ) | |
| | ) | |
| Defendants. | | |

---

## PRELIMINARY STATEMENT

This lawsuit is based on the submission of false claims by Legacy Healthcare Services, Inc., an Ohio based nonprofit corporation, organized and doing business under the laws of that state. Legacy Healthcare Services, Inc. owns and operates therapy practices in the District of Columbia and 11 states, including South Carolina. Legacy Healthcare Services, Inc. provides therapy services to the senior population in skilled nursing facilities, continuing care retirement communities, free standing assisted living communities, and independent living communities. Legacy Healthcare Services, Inc. submits claims to and is reimbursed for those therapy services by Medicare under Medicare Parts A and B. The fraud described herein was perpetuated in the United States over a period of at least 15 years.

1

Defendant Legacy Healthcare Services, Inc., through its corporate policies, procedures, and officers, and in conspiracy with Defendants Sandra Hoskins, The Deaconess Health Care Services, Co., and The Deaconess Associations, Inc., presented or caused to be presented, made or caused to be made, or used false records or statements, or caused false records or statements to be used, to get false or fraudulent claims paid or approved by Medicare under Medicare Part B. The Relators, Hazel Pracht and Jennifer Kratson, acting on behalf of and in the name of the United States of America, bring this civil action under the *qui tam* provisions of the False Claims Act and allege as follows:

## PARTIES, JURISDICTION AND VENUE

1.      Plaintiff-Relator Hazel Pracht is an individual resident of Wake County, North Carolina ("Relator Pracht").

2.      Plaintiff-Relator Jennifer Kratson is an individual resident of Wake County North Carolina ("Relator Kratson").

3.      Defendant Legacy Healthcare Services, Inc. is an Ohio nonprofit corporation that provides customers with physical, occupational, and speech therapy and wellness services ("Defendant Legacy" or "Legacy").

4.      Defendant Sandra Hoskins is an individual resident of Wake County, North Carolina, and the founder, CEO, and President of Defendant Legacy ("Defendant Hoskins").

5.      Defendant The Deaconess Health Care Services Co., is an Ohio nonprofit corporation and the parent company of Defendant Legacy ("Defendant DHCS"). **The registered agent of Defendant DHCS is Taft Service Solutions Corp. The address of the registered agent is 425 Walnut Street, Suite 1800, Cincinnati, Ohio 45202.**

2

6.      Defendant The Deaconess Associations, Inc. is an Ohio nonprofit corporation and the parent company of Defendant DHCS ("Defendant Deaconess"). **The registered agent of Defendant Deaconess is E. Anthony Woods. The address of the registered agent is 311 Straight Street, Cincinnati, Ohio 45219.**

7.      Legacy is registered and operates within Colorado, District of Columbia, Florida, Georgia, Illinois, Indiana, Missouri, North Carolina, Ohio, South Carolina, Texas and Virginia. **The Registered Agent of Legacy Healthcare Services, Inc., is Taft Service Solutions Corp. The address of the registered office of the corporation is 425 Walnut Street, Suite 1800, Cincinnati, Ohio 45202.**

8.      This lawsuit arises out of Relator Pracht's and Relator Kratson's employment with Legacy.

9.      Relator Pracht is employed by Legacy as a Physical Therapist and has worked for Legacy intermittently from 2002 until present. Relator Pracht currently works at the Legacy facility that is co-located with Wake Assisted Living, LLC, a third-party company not party to this lawsuit ("Wake Assisted Living").

10.     Relator Kratson was hired by Legacy in April of 2017 as an Occupational Therapist Assistant, and in October of 2018 she was promoted to Rehab Manager of the Legacy facility co-located with Wake Assisted Living (the "Legacy-WAL" facility) and remains in that position today.

11.     Relators Pracht and Kratson bring this action on behalf of the United States of America against Defendants for treble damages and civil penalties arising from Defendants' violations of the False Claims Act ("FCA").

12.     None of the allegations set forth in this Complaint are based on a public disclosure of allegations or transactions in a criminal, civil or administrative hearing, in a congressional, administrative or General Accounting Office report, hearing, audit, or investigation, or from the news media; the Relators are their original source.

13.     Relators have direct and independent knowledge within the meaning of 31 U.S.C. §3730(e)(4)(B) of the information on which the allegations set forth in this Complaint are based, and they have voluntarily, through their attorney, provided this information to the government by way of disclosure prior to filing this Complaint.

14.     The federal claims asserted in this lawsuit are based on violations of the FCA, False Claims Act, 31 U.S.C. § 3729, *et seq.*, for false claims.

15.     Pursuant to qui tam procedural requirements, a disclosure statement is submitted to the United States on February 7, 2019.

16.     This Court has subject-matter jurisdiction over the federal claims presented herein pursuant to 28 U.S.C. § 1331 and 1345, and false claims jurisdiction under 31 U.S.C. §3732(a).

17.     The amount in controversy exceeds $75,000.

18.     Venue is proper in the United States District Court for the District of South Carolina pursuant to 31 U.S.C. §3732(a), as a substantial part of the events or omissions proscribed by 31 U.S.C. §3729, *et seq.*, and complained of herein took place in this District, and it is also proper pursuant to 28 U.S.C. § 1391, because at all times material and relevant, Defendants transacted and continue to transact business in this District.

## IN CAMERA REVIEW

19.     Under the provisions of 31 U.S.C. §3730(b)(2), this Complaint is to be filed *in camera* and is to remain under seal for a period of at least 60 days and shall not be served on the Defendants until the Court so orders. The Government may elect to intervene and proceed with the action within 60 days after it receives both the Complaint and the material evidence and information establishing this cause of action. The Court, at its discretion may grant continuance of the Seal Order.

## APPLICABLE REGULATORY AND LEGAL BACKGROUND

20.     The United States Department of Health and Human Services (hereinafter "HHS") acting by and through the Centers for Medicare and Medicaid Services (hereinafter "CMS") is an agency of the United States of America responsible for administering the federal Medicare Programs, *see* 42 U.S.C. §1395, *et seq.*, under which healthcare facilities and providers may be reimbursed with federal funds for services provided to eligible patients or Medicare beneficiaries.

21.     The Medicare Program that provides federal reimbursement for medically necessary services and supplies used by eligible persons or Medicare beneficiaries ("beneficiaries" or "patients") was established in 1965 by Title XVIII of the Social Security Act, 42 U.S.C. §1395, *et seq.* Medicare health reimbursement is governed by statute and regulations issued by HHS.

22.     CMS is responsible for the administration of the Medicare Programs and contracts with private companies to administer Part B of the Medicare Program.

23.    Medicare allows payments under Part B (supplementary medical insurance for the aged and disabled) to cover non-institutional services such as physician services and is customarily made on a reasonable charge basis.

24.    42 U.S.C. §1320a-7b(a) prohibits anyone from knowingly and willfully making or causing to be made any false statement or representation of a material fact in any application for any benefit or payment under a Federal Healthcare Program, including Medicare.

## FACTUAL ALLEGATIONS

Pursuant to Rule 9(b) of the Federal Rules of Civil Procedure, Relators plead with particularity the following conduct:

25.    From August 2018 to present, Relator Pracht has been employed full time by Legacy as a Physical Therapist at the Legacy-WAL facility.  Intermittently from 2002 to August 2018, Relator Pracht worked for Legacy as a Physical Therapist at Legacy-WAL and eleven other Legacy facilities.

26.    From October 2018 to present, Relator Kratson has been employed full time by Legacy as an Occupational Therapist Assistant and the Rehab Manager for the Legacy-WAL facility, which means she is in charge of overseeing and managing all of the day-to-day operations of Legacy-WAL. Prior to her October 2018 promotion to Rehab Manager, from April 2017 to October 2018, Relator Kratson worked for Legacy as an Occupational Therapist Assistant at Legacy-WAL and five other Legacy facilities.

27.    Legacy's clinical providers are divided between two departments: Clinical and Operations. Despite being clinicians, therapists are placed under the Operations department.

28.     Within Legacy's Operations department: all therapists report to the Rehab Manager for their facility, the Rehab Manager reports to a designated Multi-Site Manager, the Multi-Site Manager reports to a designated Area Rehab Manager, the Area Rehab Manager reports to a designated regional Vice President of Operations, the regional Vice President of Operations reports to the Senior Vice President of Operations, and the Senior Vice Presidents of Operations reports to the Chief Executive Officer. Currently, Legacy employs approximately 50 Area Rehab Managers, three regional Vice Presidents of Operations, one Senior Vice President of Operations, and one Chief Executive Officer.

29.     During their employment with Legacy, Relators became aware of fraudulent activity throughout the company. Both Relators became aware that patients were being billed for medically unnecessary services, patient diagnoses and progress were being reported falsely to prolong therapy services, necessary Medicare documentation was not being completed as required, Medicare documentation was being inappropriately altered or falsified, and co-payments were being discounted or waived routinely and without proper basis.

30.     Both Relators have personal knowledge of the standard corporate practices, operations, procedures, protocols, and billing policies of Legacy.

31.     Upon information and belief based on Relators' personal knowledge of Legacy's corporate practices, their personal experiences working at a collective 17 Legacy facilities, and their personal communications with current and former therapists and Operations managers from other Legacy facilities in their surrounding areas and in other states, Legacy's fraudulent practices set forth in this Complaint have been systematically instituted and resulted in fraud in every Legacy facility across the country.

32.    Relators estimated that at all times from at least 2002 to present, at least 50 to 75% of all claims submitted by Legacy for reimbursement under Medicare Part B have been fraudulent.

## SPECIFIC ALLEGATIONS OF FRAUD

### I.    PROVIDING SERVICES NOT MEDICALLY NECESSARY

33.    Medicare mandates that in order to receive payment for services provided, those services must be reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. 42 U.S.C. § 1395y(a)(1)(A).

34.    Medicare allows payments under Part B to cover physical and occupational therapy services when the claim form and supporting documentation support medically necessary covered services. The documentation must justify the billed service, support any listed CPT codes, and conform to the professional guidelines of the American Physical Therapy Association (APTA) and/or the American Occupational Therapy Association (AOTA). 42 C.F.R. § 410.59-62.

35.    The act of submitting a claim for reimbursement implies compliance with the federal rules and regulations.

36.     Medicare defines medically necessary services as those services that are needed to diagnose or treat a medical condition and that meet accepted standards of medical practice. Section 1862(a) (1) (A) of the Social Security Act.

37.    For outpatient physical therapy services to be considered reasonable and necessary, each of the following quoted conditions must be met: (i) the services shall be considered under accepted standards of medical practice to be a specific and effective

treatment for the patient's condition, (ii) the services shall be of such a level of complexity and sophistication or the condition of the patient shall be such that the services required can be safely and effectively performed only by a therapist, or . . . under the supervision of a therapist, (iii) there must be an expectation that the patient's condition will improve significantly in a reasonable period of time, or the services must be necessary for the establishment of a safe and effective maintenance program required in connection with a specific disease and (iv) the amount, frequency, and duration of the services must be reasonable under acceptable standards of practice. 42 C.F.R. § 410.60.

38.    Since at least 2002 to present, Legacy has knowingly instituted an organizational reporting structure designed to cause fraud whereby therapists report to four tiers of Operations mangers. According to Legacy's corporate practices, corporate training programs undertaken by Relators, and the company's own written policy manual, the express primary job function of each of these Operations managers is to direct and implement therapy based on financial and corporate goals, with no mention of or consideration for medical necessity or patient outcomes.

39.    Since at least 2002 to present, Legacy has instituted a corporate policy and practice designed to cause fraud whereby Operations managers, not treating therapists, set and direct aggregate caseload requirements for facilities and even specific caseload requirements for individual patients, in each case based on financial and corporate goals, and without regard to and frequently directly contrary to the honestly held clinical opinions and recommendations of the treating therapist.

40.    Since at least 2002 to present, Legacy has instituted a corporate policy and practice designed to cause fraud whereby Rehab Managers, who are in charge of managing

and overseeing all activities of their facility, may not determine their own therapist staffing levels. Instead, for each Legacy facility, higher level Operations managers set the number of therapists that must be staffed, the number of hours each therapist must work, and the required billable productivity level for each hour worked. In addition, in spite of consistent protests from the Rehab Managers and treating therapists, Operations managers both systematically overstaff therapists and demand billable productivity levels that are so high that they consistently cannot be achieved without therapists committing fraud.

41.    Since at least 2002 to present, Legacy's corporate policies and practices designed to cause fraud, have been knowingly designed, implemented, and enforced by Legacy's corporate officers, including without limitation regional Vice President of Operations C.R., Senior Vice President of Operations M.H., and Chief Executive Officer Sandra Hoskins.

42.    As the direct result of Legacy's corporate policies and practices designed to cause fraud, Relators estimate that, since at least 2002 to present, at least 50 to 75% of all claims submitted by the company for Medicare reimbursement fail to meet one or more of the Medicare requirements for medical necessity.

43.    Since at least 2002 to present, Legacy has systematically caused its therapists to regularly make claims for services where the amount, frequency, and duration of the physical therapy services are not reasonable and consistent with standards of practice and are directly contrary to the treating therapist's honestly held clinical recommendations. Legacy has regularly caused its therapists to disregard the needs of residents, the majority of whom are elderly, often in their 80s and 90s, and sometimes suffering from advanced dementia.

44.     For example, in some current ongoing cases, contrary to clinical standards of care and the treating therapists honestly held clinical opinions, Legacy is directing its therapists to cause elderly patients with advanced dementia to engage in up to 90 minutes of billable "activities" per day, five days per week, for over year, even when they are too fatigued, disabled, disoriented, or agitated to perform or benefit from them.

45.     Since at least 2002 to present, Legacy's Operations managers have directed and caused therapists to continue to schedule and report the provision of therapy to specific patients even after the patient's treating therapist has recommended that the patient decrease caseload or be discharged from therapy. For example, in 2018, Area Rehab Manager S.D. called or visited Relator Kratson at least monthly to review individual patient files and direct that Relator Kratson cause her therapist to increase caseload for specific patients and place specific patients who were previously discharged back on caseload. In each case, Relator Kratson protested and attempted to justify the treating therapist's recommendations contrary to S.D.'s directions. In each case, S.D. disregarded Relator Kratson's protests and directed Relator Kratson to increase the specific caseloads anyway in order to achieve financial goals for the company.

46.     Since at least 2013 to present, Legacy has trained, directed, and caused its therapists, as a standard practice, to "pick up" patients that were previously discharged and put them back on caseload based solely on the amount of time that has passed since discharge—i.e., 30, 60, or 90 days from the date of discharge—and not based on physician/non-physician provider referral, a complaint from the patient or POA, or the patient's medical necessity.

47. Since at least 2002 to present, Legacy has directed and caused its therapists to provide therapy even after the patient's treating therapist has determined that the patient has already reached a functional plateau before the date of the service reviewed. For example, since at least 2017 to present, the company has instructed that therapists provide skilled therapy to patients even when the patients are unable to undergo or benefit from skilled therapy *e.g.*, when a patient had been transitioned to palliative end-of-life care.

48. Since at least 2012, due to the fact that Legacy requires its therapists to treat patients without medical necessity, many of the activities performed have not required the skills of a therapist. For example, in 2018, Relator and other therapists routinely spent significant amounts of therapy time walking with patients, tossing a balloon back and forth, and performing redundant and repetitive exercises that could have been performed as part of a home exercise program that did not require the skills of a therapist.

49. Since at least 2002 to present, Legacy has consistently required therapists to provide therapy treatment for patients where there is no expectation for improvement. For example, in 2018, Area Rehab Manager directed Relators Kratson and Pracht to continue to see patients who are not and have no expectation of making any progress and to pick up previously discharged patients who have had no decline or significant change in status, in each case against the clinical opinions and protests of the treating therapist.

50. As part of the fraudulent practices and policies set forth above in this Complaint, since at least 2002 to present, Relators and other therapists employed by Legacy have been required to give, record, and submit to Medicare for reimbursement Plans of Care, treatment notes, and progress records containing clinical opinions that were not honestly held by the treating therapists regarding their respective patients' medical

diagnoses, long-term function goals, the type of interventions to be performed, the quantity of services or intervention per day, and the frequency of treatment.

51.     As a direct result of such fraudulent practices, the Defendants have received payments from the Medicare program under Medicare Part B.

## II.     FALSIFYING DIAGNOSES AND MISUSING CPT BILLING CODES

52.     Medicare coding requirements state that outpatient therapy services are payable when the medical record and information on the provider's claim form consistently and accurately report covered services. CMS, *Medicare Benefit Policy Manual,* Chap. 15, § 220.3A.

53.     Since at least 2002 to present, in order to justify excessive caseloads, various of Legacy's Operations managers have regularly trained, directed, and caused Relators and other therapists to consistently and inaccurately report on initial assessments and progress notes that the patients' medical conditions are more severe than they in fact are. The purpose of falsifying the diagnoses is to make it appear as though patients require a greater amount, frequency, and duration of therapy services than is accurate. Each such diagnosis and treatment correspond to a CPT billing code.

54.     Since at least 2002 to present, various of Legacy's Operations managers have regularly trained, directed, and caused Relators and other therapists to falsely record the patient's condition as more severe than is accurate in an effort to justify longer and more intensive therapy services than is medically necessary or within the clinical standard of care. This also allowed Legacy to administer unnecessary therapy sessions in a manner designed to avoid detection from Medicare.

55.     For example, various of Legacy's Operations managers have instructed Relators and other therapists to routinely use diagnosis and treatment codes on initial evaluations to make it look like the patient needs a maximum assist when the patient only accurately needs a moderate assist from the therapist.

56.     As another example, in December 2018, a treating therapist for patient N.G. falsely recorded that the patient only had a three-minute attention span in order to justify more intensive therapy and for a longer duration than was medically necessary.

57.     Since at least 2002 to present, various of Legacy's Operations managers have also regularly trained, instructed, and pressured its therapy providers, including Relators Kratson and Pracht, to fraudulently document and submit to Medicare for reimbursement that their patients are achieving less progress and fewer goals than is accurate in an effort to justify a longer duration of therapy and maximize the available Medicare reimbursement.

58.     As a result, in each case, Legacy's therapists have knowingly made false or fraudulent statements in their Plans of Care, treatment notes, and progress records that are inconsistent with their honestly held clinical opinions in order to maximize and extend treatment and fraudulently submit to and receive reimbursement from Medicare.

## III.     FRAUDULENTLY MANIPULATING THERAPY SERVICES BASED ON MEDICARE'S 8-MINUTE RULE

59.     Medicare coding requirements state that outpatient therapy services are payable when the medical record and information on the provider's claim form consistently and accurately report covered services.  CMS, *Medicare Benefit Policy Manual,* Chap. 15, § 220.3A.

60.    When skilled therapy services are provided under Medicare Part B, providers must bill in 15-minute increments called "units." *Id.* at Chap. 5, § 20.2. Treatment greater than 8 minutes and fewer than 23 minutes is to be billed as one fifteen-minute "unit" (the "8-Minute Rule"). *Id.* at Chap. 5, § 20.2.C. For example, the provision of 23 minutes of skilled therapy will result in the same reimbursement under Medicare Part B – two units – as the provision of 37 minutes of skilled therapy.

61.    CMS has made clear that, consistent with federal law and Medicare regulations regarding medical necessity and other requirements: "The expectation is that a provider's direct patient contact time for each unit will average 15 minutes in length. If a provider has a consistent practice of billing less than 15 minutes for a unit, these situations should be highlighted for review." *Id.*

62.    The Department of Justice publication *Documentation Essentials in Long-Term Care* provides examples of "Red Flag Practices," which the publication defines as "a warning signal," "something that demands attention," and "an indicator of potential problems." *Documentation Essentials in Long-Term Care*, United Stated Department of Justice; available at: https://www.justice.gov/usao-ma/file/812251. One Red Flag Practice is described as follows: "A pattern of over-delivery of minutes at the low end of the 8-minute rule limit (23, 38, 53, 68, 83) indicates a practice of maximizing financial reimbursement rather than delivery of care to meet the needs of the resident." *Id.* at 70.

63.    *Documentation Essentials in Long-Term Care* also provides examples of "Fraudulent Practices," defined as "a deception deliberately practiced in order to secure unfair or unlawful gain." *Id.* at 74. In explaining Fraudulent Practices, the publication states, "Medicare expects that: Residents should receive services based on medical

necessity. <u>Manipulating therapy minutes based on financial gain rather than the resident's needs is considered fraud.</u>"  *Id*. at 74 (emphasis added).

64.    In order to train and direct its therapists to commit fraud with respect to Medicare's 8-Minute Rule, late-August 2017, Legacy created, circulated to employees, and posted as a company policy and therapist training tool a "<u>Minute Minder Tool</u>" that compares the therapy minute increments and their corresponding units, including which minute increments result in what the company refers to as a "Red Flag."  An abbreviated version of the chart is as follows:

| TIME | UNITS |
|------|-------|
| 8-22 | 1 |
| 23-37 | 2 |
| 23-32=No Flag | 33-37=Red Flag |
| 38-52 | 3 |
| 38-47=No Flag | 48-52=Red Flag |

65.    Below the TIME/UNITS chart, the Minutes Minder Tool reads: "***Treat residents for appropriate amount of time based on individual needs for that day. If you fall within the <u>RED FLAG</u> zones and resident is appropriate to treat for a few extra minutes, then treat until you are out of the <u>RED FLAG</u> zone!***" (Emphasis in original.)

66.    In order to enforce the company's fraudulent policies regarding Medicare's 8-Minute Rule, since at least 2017 to present, Legacy has used a software program called *SMART* to track, log, and alert the therapist when treatment minutes are within five minutes of the next unit.

67.    To further enforce the company's fraudulent policies regarding Medicare's 8-Minute Rule, since at least 2017 to present, the *SMART* software also generates "Missing Minutes Reports," which Operations managers are instructed to generate daily and use to

16

discipline and reeducate delinquent therapists that provide therapy based on patient need instead of fraudulently manipulating the Medicare reimbursement system.

68.    In November 2018, Legacy Area Rehab Manager S.D. directly trained Relator Kratson, in her role as a facility Rehab Manager, on the company's official policy and intended use of the Minute Minder Tool and Missing Minutes Reports. As part of Relator Kratson's training, S.D. provided a detailed explanation: Legacy's purpose for those tools, and Relator Kratson's job as a facility Rehab Manager, is to enforce the company policy that all therapists are required to provide therapy only in the time increments that maximize Medicare reimbursement, and not based on the therapist's honestly held clinical opinions or the individual needs of the patient.

69.    As a direct result of Legacy's policies and practices designed to cause therapists to commit fraud to Medicare's 8 Minute Rule, since at least 2011, Legacy's therapists have systematically engaged in a pattern of over-delivery of minutes at the low end of the 8-Minute Rule limit (23, 38, 53, 68, 83) in order to fraudulently maximize reimbursement rather than treating in time increments based on the resident's needs.

70.    As a result, in each case, Legacy's therapists have recorded fraudulent therapy services in the patient's medical records and Medicare documentation and successfully submitted the same to Medicare for reimbursement under Part B.

## IV.    BILLING FOR SERVICES RENDERED WITHOUT REQUIRED MEDICARE DOCUMENTATION

71.    Medicare documentation requirements state that outpatient physical therapy services must be in accordance with a written plan established before treatment begins. 42 C.F.R. § 410.60. The plan must contain the type, amount, frequency, and duration of the

physical therapy services to be furnished and must indicate the diagnosis and anticipated goals. *Id.*

72.     The *Medicare Benefit Policy Manual* dictates that goals should be measurable and pertain to identified functional impairments. In addition, the signature and professional identity of the person who established the plan and the date it was established must be recorded with the plan. CMS, *Medicare Benefit Policy Manual*, Chap. 15, Sec. 220.1.2A and B (Rev. 251, Nov. 30, 2018).

73.     Additionally, therapists are required to recertify the plan of care when a significant modification of the plan is needed or at least every 90 days after the initial treatment. 42 C.F.R. § 424.24(c)(4).

74.     Therapists must also create and maintain a treatment note for each treatment day and each therapy service. The treatment note should include the date of treatment, each specific service provided and billed for, the total treatment minutes for timed codes and total minutes for the entire therapy session, and the signature and professional identification of the therapist who furnished or supervised the service. CMS, *Medicare Benefit Policy Manual*, Chap. 15, Sec. 220.3E.

75.     Since at least 2013 to present, Relators and other therapists have regularly provided physical therapy to patients (i) before an initial Plan of Care is signed, (ii) without recording a sufficient daily note for each treatment day and each therapy service, (iii) after a tenth visit has occurred without a new Progress Record recorded, and (iv) after the Plan of Care has expired and before a new updated Plan of Care has been created or certified. In each case, Legacy has knowingly or recklessly billed to and received reimbursement

from Medicare for the therapy services provided without the required Medicare documentation in place.

76.     Legacy has knowingly or recklessly caused this practice to occur due to a combination of two factors: (i) Legacy provides minimal emphasis on training and oversight on this topic, presumably due to the fact that Medicare's current system does not automatically flag or deny reimbursements for therapy services provided without this type of required documentation, and (ii) therapists including C.G. have reported to Relators that they are disinclined to complete the Medicare documentation, and thus struggle and frequently fail to complete the documentation, because they know that the only way to do so would be to create a false and fraudulent record in violation of United States law.

77.     In November 2018, Legacy Area Rehab Manager S.D. reported to Relator Kratson and others that Legacy has actual knowledge that their therapists regularly bill Medicare for therapy services without the required Medicare documentation in place, and that Legacy has two spreadsheets—a "Physicians Signature Tracking Log" and an "Incomplete Documentation Report"—that tracks all of the missing documentation.

78.     Legacy knowingly engages in these fraudulent practices in order to obtain personal benefit due to the fact that increased training and oversight of these issues would require corporate resources, and remedying all of the past instances where Legacy has billed Medicare for therapy services without the required Medicare documentation would also require corporate resources and would likely result in reimbursement denials and refund demands from Medicare.

79.     Legacy benefits from billing Medicare for services rendered without the required Medicare documentation in place by receiving Medicare reimbursement without having to expending the corporate resources required to ensure proper compliance.

## V.     ALTERING AND/OR FALSIFYING MEDICARE DOCUMENTATION

80.     Pursuant to the *Medicare Program Integrity Manual*, all services provided to beneficiaries shall be documented in the medical record at the time they are rendered. CMS, *Medicare Program Integrity Manual*, Chap. 3, Sec. 3.3.2.5A (Rev. 732, July 21, 2017).

81.     Occasionally, certain entries related to services provided are not properly documented. In this event, the documentation will need to be amended, corrected, or entered after rendering the service. *Id.*

82.     Regardless of whether a documentation submission originates from a paper record or an electronic health record, documents submitted containing amendments, corrections or addenda must: clearly and permanently identify any amendment, correction or delayed entry as such, clearly indicate the date and author of any amendment, correction or delayed entry and clearly identify all original content, without deletion. *Id.*

83.     Records sourced from electronic systems containing amendments, corrections or delayed entries must distinctly identify any amendment, correction or delayed entry and provide a reliable means to clearly identify the original content, the modified content and the date and authorship of each modification of the record.  CMS, *Medicare Program Integrity Manual*, Chap. 3, Sec. 3.3.2.5B.

84.     As described above, Legacy regularly bills Medicare for services rendered without the required Medicare documentation in place. In November 2018, Legacy Area

Rehab Manager S.D. reported to Relator Kratson and others that Legacy has actual knowledge that their therapists regularly bill Medicare for therapy services without the required Medicare documentation in place.

85.    Shortly after that call, Legacy Multi-Site Manager L.C. and others began re-creating and backdating some of the missing Medicare documentation in violation of Medicare rules. For example, on November 25, 2018, L.C. re-created and backdated for patient R.G. a "Therapist Progress & Updated Plan of Care" dated July 5, 2018 and a "Therapy Progress" record dated July 23, 2018.  L.C. did not create or submit a delayed certification as part of the patient records, as required by Medicare regulations.

86.    Upon information and belief, Legacy causes its Operations managers to regularly engage in the practice of re-creating and backdating missing Medicare documentation in order to financially benefit from therapy services rendered without the required Medicare documentation in place.  Legacy benefits from this fraudulent practice by continuing to receive financial reimbursements from Medicare for therapy services rendered without the required Medicare documentation in place.

## VI.    DISCOUNTING CO-PAYMENTS ROUTINELY AND WITHOUT ANY PROPER BASIS IN VIOLATION OF THE ANTIKICKBACK STATUTE

87.    The routine waiver of deductibles and co-payments by charge-based providers, practitioners or suppliers is unlawful because it results in (1) false claims, (2) violations of the anti-kickback statutes, and (3) excessive utilization of items and services paid for by Medicare. Department of Health and Human Services, Publication of OIG Special Fraud Alerts, 59 Fed. Reg. 65372, 65374-75 (Dec. 19, 1994).

88.    A provider, practitioner, or supplier who routinely waives Medicare co-payments or deductibles is misstating its actual charge; therefore, a false claim can result from this practice. *Id.*

89.    The *Medicare Claims Processing Manual* further provides that Physicians or suppliers who routinely waive the collection of deductible or coinsurance from a beneficiary constitute a violation of the law pertaining to false claims and kickbacks. . . Deductible and coinsurance amounts are taken into account (included) in determining the reasonable charge for a service or item. In this regard, a billed amount that is not reasonably related to an expectation of payment is not considered the actual charge for the purpose of processing a claim or for the purpose of determining a customary charge. CMS, *Medicare Claims Processing Manual*, Chap. 23, Sec. 80.8.1.

90.    From at least 2002 to 2017, Legacy engaged in a standard corporate practice of granting co-payment deductions routinely and automatically to all patients, regardless of hardship, and without any investigation or corresponding paperwork.

91.    In 2017, Legacy realized that its practices were in violation of United States law and attempted to remedy the process by asking Rehab Managers to fill out paperwork justifying co-payment deductions. With Legacy's knowledge, from 2017 to 2018, Rehab Managers, including C.G., continued to routinely grant co-payment deductions for all patients, regardless of hardship, and without any investigation; however, they engaged in the new practice of routinely falsifying the patient's financial information on co-payment waiver documentation in a fraudulent attempt to justify co-payment reductions.

92.    From 2018 to present, Legacy has trained and directed its Rehab Managers that, upon identifying a potential new patient, before anyone from Legacy makes any

contact with that person, the Rehab Manager is required to obtain the resident's medical records and extract the resident's name, date of birth, and Social Security number in order to verify that resident's insurance. As a standard corporate practice, if the resident has *any* co-payment, then the Rehab Manager is supposed to e-mail his or her Operations manager in order to request a co-payment reduction. According to Legacy's policy manual, the company's corporate controller then reviews the co-payment reduction application and returns an approved co-payment waiver to the Rehab Manager.

93.    After the Rehab Manager receives the approved insurance verification and co-payment waiver, the Rehab Manager makes contact with that resident for the very first time. In the initial contact, the Rehab Manager schedules an appointment to evaluate the patient and develop a Plan of Care.

94.    The co-payment waivers approved by Legacy's corporate controller include information designed to justify the waiver, including information about the patient's income, expenses, and Plan of Care.

95.    Upon information and belief, Legacy's corporate controller performs inadequate or zero investigation into the patient's income and expenses and regularly inputs invented and falsified information regarding the same on the approved co-payment waivers.

96.    The approved co-payment waivers also include information about the patient's Plan of Care and cost of the treatment plan, including the number of therapy visits needed and what therapy will be provided during each session, including CPT codes; however, at the time the co-payment waiver is approved, the patient has never been evaluated or even contacted by any Legacy therapist, and no Plan of Care exists. Upon

23

information and belief, Legacy's corporate controller inputs invented and falsified information regarding the patient's Plan of Care and related information on the approved co-payment waivers.

97.    Legacy knowingly engages in the fraudulent practices related to discounting co-payments routinely and without any proper basis, as set forth above, in order to induce patients to obtain more therapy services than they would without a co-payment reduction. As a result, Legacy provides therapy services to more patients and for longer durations than they otherwise would and thereby financially benefits from the resulting fraudulent Medicare reimbursements.

## VII.    CONSPIRACY WITH DEFENDANT SANDRA HOSKINS

98.    Upon information and belief, at all times since Legacy was founded until November 9, 2018, Defendant Hoskins directly or indirectly owned a materially significant quantity of the outstanding stock of Legacy; and such equity ownership caused Defendant Hoskins to personally benefit financially and otherwise based on the size, growth, and profitability of Legacy.

99.     Upon information and belief, at all times since Legacy was founded and from at least 2002 to present, Defendant Hoskins knowingly and systematically created, implemented, and enforced the fraudulent corporate organizational structure, practices, and policies set forth in this Complaint in order to increase the size, growth, and profitability of Legacy and personally benefit financially and otherwise therefrom.

100.    Upon information and belief, at all times since Legacy was founded and from at least 2002 to present, as a direct result of the fraudulent corporate organizational structure, practices, and policies set forth in this Complaint, Legacy in fact increased in

size, growth, and profitability, and Defendant Hoskins personally benefitted financially and otherwise therefrom.

101.    According to the Unanimous Written Consent of the Board of Trustees of Defendant Deaconess dated December 6, 2018, on November 9, 2018, Legacy and Defendant Deaconess, acting through its wholly owned subsidiary Defendant DHCS, entered into a transaction pursuant to which all of the outstanding stock of Legacy was sold to and acquired by Defendant DHCS (the "Transaction").

102.    Upon information and belief, immediately prior to the Transaction, Defendant Hoskins directly or indirectly owned a materially significant quantity of the outstanding equity of Legacy.

103.    Upon information and belief, in the years and months prior to the Transaction, Defendant Hoskins performed industry standard internal due diligence on Legacy in order to prepare the company to be sold, including without limitation evaluating the company's assets, liabilities, and practices that might be material to a potential buyer of the company and their impacts on the potential purchase price.

104.    Upon information and belief, in the alternative, if Defendant Hoskins did not have actual knowledge of *some* the Legacy's fraudulent practices prior to performing the industry standard internal due diligence to prepare for a sale of the company, in the course of performing such internal due diligence in the years and months prior to the Transaction, Defendant Hoskins obtained or should have obtained actual knowledge of Legacy's organizational structure, policies, practices, employment practices, and training tools that, on their face, are designed to cause fraud and/or explicitly direct Legacy's therapists to commit fraud.

25

105.    Upon information and belief, in the years and months prior to the Transaction, in the course of performing industry standard internal due diligence to prepare for a sale of the company, Defendant Hoskins knowingly created and directed that the fraudulent corporate policies and practices set forth in this Complaint be continued, enforced, and expanded in order to increase the enterprise value of the company and the purchase price to be received by Defendant Hoskins.

106.    Upon information and belief, as the result of the fraudulent corporate policies and practices set forth in this Complaint, the purchase price paid pursuant to the Transaction was higher than it otherwise would have been, and Defendant Hoskins personally and materially benefitted financially and otherwise therefrom.

## VIII.    CONSPIRACY WITH DEFENDANTS DEACONESS AND DHCS

107.    According to the Unanimous Written Consent of the Board of Trustees of Defendant Deaconess dated December 6, 2018, the November 9, 2018 sale of all of the outstanding stock of Legacy (the "Transaction") was performed *by Defendant Deaconess, acting through its wholly owned subsidiary Defendant DHCS*.

108.    Upon information and belief, in the course of the Transaction, Defendant Deaconess and DHCS each performed industry standard due diligence on Legacy, including without limitation on Legacy's assets, liabilities, financials, organizational structure, policies, practices, employment practices, and training tools.

109.    Upon information and belief, in the course of industry standard due diligence, Defendant Deaconess and DHCS obtained or should have obtained actual knowledge of the Legacy's organizational structure, policies, practices, employment practices, and training tools that, on their face, are designed to cause fraud and/or explicitly

direct Legacy's therapists to commit fraud. Further, in the course of an industry standard due diligence or a mere cursory review comparing Legacy's financial statements to its resident and patient populations, Defendant Deaconess and DHCS each obtained or should have obtained actual knowledge that Legacy was necessarily engaging fraudulent practices including fraudulently overbilling for services and/or fraudulently providing more therapy services than medically necessary.

110.    Upon information and belief, Defendant Deaconess, acting through Defendant DHCS, acquired all of the outstanding stock of Legacy and provided financial and other resources, oversight, and direction to Legacy for the purpose of financially benefiting from Legacy's schemes of fraud.

111.    Upon information and belief, Defendant Deaconess and DHCS have each actually benefitted financially and otherwise from its acquisition of Legacy and Legacy's schemes of fraud.

112.    Due to the fact that the above described fraudulent schemes are continuing and ongoing, Defendants Deaconess and DHCS continue to knowingly benefit financially and otherwise from Legacy's continued submission of fraudulent claims to and receipt of reimbursements from Medicare.

## CAUSES OF ACTION

## I.     VIOLATION OF THE FALSE CLAIMS ACT (31 U.S.C. § 3729(A)(1)(A))

113.    Relators reaffirm and reallege the foregoing paragraphs as if set for fully verbatim as related to this specific claim.

114.    From at least 2002 to present, Defendant Legacy, in conspiracy with Defendants Hoskins, DHCS, and Deaconess, participated in, filed claims with, sought

reimbursement for and actually received funds from the Federal Payers Program, specifically Medicare, for providing services to beneficiaries.

115.    From at least 2002 to present, Defendant Legacy, in conspiracy with Defendants Hoskins, DHCS, and Deaconess, participated in, filed claims with, sought reimbursement for and actually received funds from Medicare for providing services to beneficiaries which were medically unnecessary.

116.    From at least 2002 to present, Defendant Legacy, in conspiracy with Defendants Hoskins, DHCS, and Deaconess, routinely waived co-payments required of their patients thereby misstating the actual charge for services rendered in an effort to induce patients to agree to services in violation of the federal Anti-Kickback Statute.

117.    Claims that arise from Defendants' kickback scheme are false and violate the False Claims Act because they are the result of a kickback – no further express or implied false statement is required to render such infected claims false, and anon can render the claim legitimate.

118.    As a result of providing the aforementioned services to Medicare insured's in violation of the Federal Payer Conditions of Participation, Defendant Legacy, in conspiracy with Defendants Hoskins, DHCS, and Deaconess, submitted, caused to be submitted, or assisted or supervised the submission of fraudulent claims to the Federal Payer Program for payment in violation the False Claims Act.

119.    The process for requesting payment for services rendered to the Federal Payer Program beneficiaries required the submission of individual claim forms by Legacy for each patient which represented that the services provided to the Medicare beneficiaries

were provided in accordance with existing applicable law and regulatory authority, when in actuality services were not being provided in accordance with applicable law.

120.    In furtherance of its plan and scheme, Defendant Legacy, in conspiracy with Defendants Hoskins, DHCS, and Deaconess, presented or caused to be presented false claims for and received illegal payments based upon those claims presented to the United States Government in violation of 31 U.S.C. § 3729(a)(1)(A).

121.    The United States has been damaged as a result of the violation of the False Claims Act by Legacy and the government is entitled to be reimbursed for monies obtained by Defendants and for the amount of money by which it has overcompensated Defendant Legacy, for fraudulent claims it presented or caused to be presented for payment or approval to the United States of America.

122.    The United States of America is entitled to treble damages based upon the amount of damages sustained by the United States of America as a result of violations of 31 U.S.C. § 3729(a)(1) by Defendant Legacy in conspiracy with Defendants Hoskins, DHCS, and Deaconess.

123.    The United States of America is entitled to a civil penalty between $5,000 and $10,000 as required by 31 U.S.C. § 3729(a)(1) for each fraudulent claim made by Defendant Legacy in conspiracy with Defendants Hoskins, DHCS, and Deaconess.

124.    That Relators are also entitled to reasonable attorney's fees and costs pursuant to 31 U.S.C. § 3730(d) and a percentage of the government's recovery.

## II.    VIOLATION OF FALSE CLAIMS ACT (31 U.S.C. 3729(A)(1)(B))

125.    Relators reaffirm and reallege the heretofore pled paragraphs as if set forth fully verbatim as related to this specific claim.

126.    Relators allege that in performing the acts heretofore set forth, Defendant Legacy, in conspiracy with Defendants Hoskins, DHCS, and Deaconess, knowing made, used, or caused to be made or used false records or statements to get a false or fraudulent claim paid or approved by the government to the damage of the United States of America in violation of 31 U.S.C. §3729(a)(1)(B). As a result, Legacy has knowingly presented or caused to be presented to an officer or employee of the United States of America false or fraudulent claims for payment or approval in violation of 31 U.S.C. §3729(a)(1).

127.    The United States of America has been damaged as a result of the violation of the False Claims Act by Defendants Legacy, Hoskins, DHCS, and Deaconess and as such is entitled to be reimbursed for the monies obtained by it for fraudulent claims it presented or caused to be presented for payment or approval.

128.    The United States of America is entitled to treble damages based upon the amount of damages sustained by the United States of America as a result of violations of law by Defendants Legacy, Hoskins, DHCS, and Deaconess.

129.    The United States of America is entitled to a civil penalty between $5,000 and $10,000 as required by 31 U.S.C. §3729(a)(1) for each fraudulent claim made by Defendant Legacy, in conspiracy with Defendants Hoskins, DHCS, and Deaconess.

130.    Relators are also entitled to reasonable attorney's fees and costs, pursuant to 31 U.S.C. §3730(d) and a percentage of the government's recovery.

## III.    VIOLATION OF FALSE CLAIMS ACT (31 U.S.C. 3729(A)(1)(C))

131.    Relators reaffirm and reallege the heretofore pled paragraphs as if set forth fully verbatim as related to this specific action.

132.    Relators allege that in performing the acts hereinbefore set forth, Defendant Legacy, in conspiracy with Defendants Hoskins, DHCS, and Deaconess, knowing made, used, or caused to be made or used false records or statements to get a false or fraudulent claim paid or approved by the government to the damage of the United States of America in violation of 31 U.S.C. §3729(a)(1). As a result, Defendant Legacy, in conspiracy with Defendants Hoskins, DHCS, and Deaconess, has knowingly presented or caused to be presented to an officer or employee of the United States of America false or fraudulent claims for payment or approval in violation of 31 U.S.C. §3729(a)(1).

133.    The United States of America has been damaged as a result of the violation of the False Claims Act by Defendant Legacy, in conspiracy with Defendants Hoskins, DHCS, and Deaconess, and as such is entitled to be reimbursed for the monies obtained by it for fraudulent claims it presented or caused to be presented for payment or approval.

134.    The United States of America is entitled to treble damages based upon the amount of damages sustained by the United States of America as a result of violations of law by Defendants Legacy, Hoskins, DHCS, and Deaconess.

135.    The United States of America is entitled to a civil penalty between $5,000 and $10,000 as required by 31 U.S.C. §3729(a)(1) for each fraudulent claim made by Defendant Legacy in conspiracy with Defendants Hoskins, DHCS, and Deaconess.

136.    Relators are also entitled to reasonable attorney's fees and costs, pursuant to 31 U.S.C. §3730(d) and a percentage of the government's recovery.

## PRAYER FOR RELIEF

**WHEREFORE**, Relators, on behalf of themselves and the United States Government, pursuant to 31 U.S.C. § 3730(c)(5) and (d) prays as follows:

137.    This Court enter judgment against Defendants Legacy, Hoskins, DHCS, and Deaconess in an amount equal to three times the amount of damages the United States Government has sustained because of Defendants' actions, plus a civil penalty of between $5,000 and $10,000 for each action in violation of 31 U.S.C. § 3729 and as adjusted upward by law, and the costs and expenses of this action, with interest, including the costs to the United States Government for its expenses related to this action;

138.    If this action proceeds or the United States Government proceeds with any alternative remedy, Relators be awarded an amount the Court decides is reasonable for collecting the civil penalty and damages;

139.    The United States Government and Relators receive all relief from Defendants, available at law and at equity, to which they may reasonable appear entitled, including all litigation costs and reasonable attorney's fees incurred by the federal government and the Relators as provided pursuant to 31 U.S.C. 3730(h) and other applicable law;

140.    The Court compel a complete an accounting from Defendants; and

141.    Such further relief as the Court deems just and proper.

## JURY DEMAND

**RELATORS DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Respectfully submitted this 6th day of February 2019.

*Signature on the Following Page*

32

**BOWERS LAW OFFICE LLC**

s/ Karl S. Bowers, Jr.
Karl S. Bowers, Jr.
Bowers Law Office LLC
Fed. Bar No. 7716
P.O. Box 50549
Columbia, South Carolina 29250
Telephone: (803) 753-1099
Telecopier: (803) 250-3985
E-Mail: butch@butchbowers.com


**MILLER LAW GROUP, PLLC**


s/ W. Stacy Miller, II
W. Stacy Miller, II (pending admission *pro hac vice*)
Miller Law Group, PLLC
Post Office Box 1769
Raleigh, North Carolina 27612
Telephone: (919) 348-4361
Telecopier: (919) 729-2953
E-Mail: stacy@millerlawgroupnc.com
N.C. State Bar No. 21198


s/ Blannie Cheng
Blannie Cheng (pending admission *pro hac vice*)
Miller Law Group, PLLC
Post Office Box 1769
Raleigh, North Carolina 27612
Telephone: (919) 348-4361
Telecopier: (919) 729-2953
E-Mail: blannie@millerlawgroupnc.com
N.C. State Bar No. 41156